Ceferino-Basilio Selga **PADILLA**, Jr., Relator,

v.

**MINNESOTA STATE BOARD OF MEDICAL EXAMINERS,** Respondent.

No. C8–85–1738.

Court of Appeals of Minnesota.

March 4, 1986.

Review Denied April 24, 1986.

Jeffrey R. Anderson, Susan Bedor, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., John A. Breviu, Sp. Asst. Atty. Gen., Minneapolis, for respondent.

Heard, considered, and decided by POPO-VICH, C.J., and WOZNIAK and SEDG-WICK, JJ.

## OPINION

WOZNIAK, Judge.

Ceferino-Basilio Selga Padilla, Jr. appeals from an order of the Minnesota State Board of Medical Examiners revoking his license to practice medicine. He contends (1) his due process rights were violated because the Board applied the evidentiary rules for use in contested cases, Minn.Stat. § 14.60, subd. 1, rather than the Rules of Evidence; (2) the Minnesota Government Data Practices Act precludes the admission of evidence seized by the Medicaid Fraud Unit of the Attorney General's office; (3) his right to cross-examine witnesses was violated; (4) the administrative law judge erred by refusing him access to certain records; and (5) the Board's conclusions were not supported by substantial evidence. We affirm.

## FACTS

Padilla is licensed to practice medicine in Minnesota. He treats from five to twenty percent of his patients for obesity.

Padilla considers any person weighing ten pounds over his or her ideal body weight to be obese. He follows a "set point theory" of obesity which requires the indefinite use of anorexigenic drugs if the patient is obese under his standard. He believes that anorexigenics can be used on a continuing basis without the development of a tolerance, and that lifelong use is required because a weight rebound will occur if the patient stops taking them.

Beginning in February 1981, Padilla treated M.C. for obesity with anorexigenics. M.C. was not weighed or measured at his first visit. No history was taken and no examination was made until December 1981. Padilla continued to prescribe anorexigenics even though he was concerned that M.C. was addicted. Over the course of the treatment, M.C. gained 17 pounds.

Padilla treated L.H. with Preludin, an anorexigenic. She was not ten pounds over her ideal body weight. His treatment continued from December 1975 through a portion of 1983. He never took a history or did a physical examination.

Padilla treated D.C. for obesity with anorexigenics from March 1981 to October 1981 without taking a history or giving a physical examination.

Padilla began treating B.F. for obesity with an anorexigenic without taking a medical history or performing a physical examination. At the time, B.F. was 13½ pounds over her ideal body weight. After treatment began, a police officer told Padilla that B.F. was a known drug user and prescription forger. Padilla continued to prescribe anorexigenics.

After a fall, M.R. went to Padilla complaining of back and neck pain. She saw him nine times between January 16 and March 12, 1984. On most visits, Padilla gave M.R. a pelvic examination. Each examination was longer than the preceding

one. During the course of the March 12 examination, Padilla began having intercourse with M.R. M.R. was in shock when she realized what was happening. She immediately got off the examination table. Padilla said he could not be her doctor anymore. He put his hands on her shoulders and kissed her on the cheek. When she pushed him away, Padilla said he had feelings for her. M.R. said he could not do things like that and told him to leave.

On November 3, 1975, Padilla began treating A.V. for stress. She was 19 years old at the time. Even though A.V. did not have time for a history and physical examination, Padilla prescribed Placidyl to help her sleep and regularly refilled the prescription. Placidyl is a hypnotic drug generally used in a hospital setting for a limited duration of approximately one week. A history was taken and a physical examination was performed on October 20, 1976. By early 1977, Padilla knew A.V. was addicted to barbiturates and sleeping medications. He continued to regularly prescribe Placidyl through August 4, 1978. On August 4, 1978, Padilla began prescribing Librium and Valium. From April 27, 1979 to November 23, 1984, Padilla regularly prescribed Esgic or Fiornal. He admits that his prescriptions for some months were excessive.

Beginning in the fall of 1979, Padilla periodically had sexual intercourse with A.V. After intercourse, Padilla would give A.V. prescriptions for Esgic and Fiornal. A.V. believed that having sex with Padilla was a way of insuring that he would continue to write the prescriptions she wanted. At Padilla's request, A.V., who was receiving medical assistance, frequently paid for her prescriptions with cash.

In 1978 Padilla hospitalized D.O. for neck and back pain. When she was hospitalized, D.O. told Padilla that she had been a prostitute when she was younger and that she had abused drugs. The day after that conversation, Padilla told D.O. that if she was not married, he would like to have an affair with her. D.O. thought he was joking. A few days after her discharge, Padilla called

D.O. at home and asked her when she would be coming in for her pelvic examination and mentioned his earlier reference to an affair. The reference made D.O. uncomfortable, and she did not schedule a pelvic examination. Thereafter she usually saw other doctors in Padilla's group.

Between 1978 and 1982, D.O. was treated for a variety of medical problems. There are frequent references in her medical history to depression and family problems. She resumed her abuse of drugs.

In March 1982, D.O. made an appointment with Padilla to obtain a prescription for Preludin, which she hoped to sell in order to purchase other drugs. Padilla gave her the prescription and thereafter frequently prescribed anorexiants. During office visits in late 1982, Padilla made sexual overtures to D.O. She consented to a pelvic examination. From then on, they had sexual intercourse on most of her visits to his office. In February 1983, Padilla noted in his records that D.O. might be dependent on Demerol. On several subsequent occasions, he gave her a placebo, but continued to prescribe anorexiants. In October, D.O. told Padilla that she was addicted to heroin. Padilla prescribed Preludin on her next visit, October 27.

L.W. accompanied D.O. to Padilla's office on October 27 to obtain Preludin. L.W. understood from D.O. that Padilla would prescribe Preludin if she granted sexual favors. Padilla examined L.W.'s lungs, heart and abdomen, as well as giving her a pelvic examination. They arranged for L.W. to call Padilla the next Saturday so they could have sex. Padilla did not weigh her, but did give her the prescription. L.W. is 5'1" and did not weigh over 110 pounds at the time.

Two days later, D.O. and L.W. had an argument over money. D.O. and her friends intended to collect the money forcibly by having L.W. engage in sex for money. L.W. reported the matter to the police. D.O. was subsequently charged on several criminal counts and on her release from jail called Padilla and told him that L.W. had

told the police that she had obtained drugs from him.

D.S., who was clearly obese, was treated by a colleague of Padilla's before he began treating her in 1978. During the period of treatment, a pharmacy advised Padilla that D.S.'s prescription for Preludin had been altered from 21 to 51 tablets. After D.S. was hospitalized for an overdose of over-the-counter diet pills, there was a break in her treatment for obesity. Treatment resumed in 1982. In June 1983 D.S. weighed 270 pounds. Padilla refused to refill her prescription because of high blood pressure.

In March 1984, during the course of her physical, Padilla told D.S. that she had very nice breasts. When he completed her pelvic examination, he put his hands on both sides of her face and tried to kiss her, stating that he found her very attractive and that he would like to make love to her. D.S. became very nervous and began dressing. Padilla put one hand around her waist and brought his other hand up to her breast and tried to kiss her again. She pushed him away, telling him he was crazy. After getting dressed, she told Padilla that she wanted to resume a weight loss program. He gave her a prescription. When D.S. got up to leave, Padilla put his hands around her and pressed his body against hers. She could tell he was sexually aroused. She left and filed complaints with the police and the Board.

The Board charged Padilla with violations of Minn.Stat. § 147.021, subd. 1(g), (i) and (k) (1984). A hearing was held before an administrative law judge. The administrative law judge made findings relating to the treatment for obesity and a number of Padilla's patients. With regard to obesity, the administrative law judge found that weight reduction is generally maintained in direct relation to the speed at which weight is lost. Thus, the generally accepted goals in treating obese patients are to do no harm to the patient and to reduce the weight in a consistent and relatively slow manner. The generally accepted method of losing weight is through a combination of diet and exercise. Anorexigenic drugs are not generally accepted, and if used at all are only to be used on a short-term basis (2 to 3 weeks) to get a patient started by showing him or her that the weight can in fact be lost. Anorexigenics were accepted for use in treating obesity in the 1960s, but have not been generally used in the last 15 years because of their potential for abuse, their lack of long-term benefit, and their potential for raising the blood pressure and creating cardiovascular problems. Anorexigenics are central nervous system stimulants and can be habitforming. On the street, they are dissolved in water and injected, producing a euphoric state. The prevailing medical practice is not to prescribe them to patients who are chemically dependent or drug abusers.

The administrative law judge found that Padilla prescribed anorexigenic drugs to patients who are not obese and did not need them; he prescribed them on a long-term basis without taking histories and giving physical examinations; and he prescribed them with excessive frequency and in exchange for sexual favors. He further found that prescriptions of anorexigenics to persons at or below their ideal body weight is inconsistent with minimal standards of acceptable practice. He concluded:

5. That the Respondent's failure to take a timely history and perform a timely physical examination of L.W., M.C., L.H., D.C., and B.F. prior to treating them for obesity and prescribing anorexiants on a long-term basis was inconsistent with the minimal standards of acceptable and prevailing medical practices for the purposes of Minn.Stat. § 147.021, subd. 1(k) (1984).

6. That the Respondent engaged in unprofessional and unethical conduct demonstrating a willful and careless disregard for the welfare of his patients by having a sexual relationship and sexual intercourse with patients D.O. and A.V., contrary to the

provisions of Minn.Stat. § 147.021, subd. 1(g) and (k) (1984).

7. That the Respondent prescribed anorexiants to L.W. and L.H. when those patients were not obese, even by his standards, contrary to the minimal standards of acceptable and prevailing medical practice of internal medicine thereby violating Minn. Stat. § 147.021, subd. 1(k) (1984).

8. That the Respondent made unwanted sexual advances, touchings and solicitations of patient D.S. contrary to provisions of Minn.Stat. § 147.-021, subd. 1(g) and (k) (1984).

9. That the Respondent had nonconsensual sexual intercourse with patient M.R. during the course of a pelvic examination and that such conduct constitutes unethical and deleterious conduct, demonstrating a willful and careless disregard for the health, welfare and safety of that patient and constitutes unprofessional conduct inconsistent with the minimal standards acceptable in prevailing medical practices for the purpose of Minn.Stat. § 147.021, subd. 1(g) and (k) (1984).

10. That the Respondent's long-term prescription of Placidyl to A.V. was inconsistent with the minimal standards of acceptable and prevailing medical practice of internal medicine and constitutes unprofessional conduct for purposes of Minn.Stat. § 147.021, subd. 1(k) (1984).

11. That the long-term prescription of anorexiants for weight loss is not generally acceptable as appropriate in the field of internal medicine, but is done by a minority of physicians in that field and is not inconsistent with the minimal standards of acceptable prevailing medical practice or a threat to the health or welfare of patients for the purposes of Minn.Stat. § 147.021, subd. 1(g) and (k) (1984).

12. That the Respondent's prescription of anorexiants to D.O., D.S., M.C.

and B.F. who he knew were chemically dependent or he knew were abusing or had abused drugs was inconsistent with the minimal standards of prevailing and acceptable medical practice for the purpose of Minn.Stat. § 147.021, subd. 1(k) (1984).

The Board adopted the findings of the administrative law judge and its conclusions, except conclusion 11. The Board substituted its own conclusion 11, which states that the long-term prescription of anorexiants for weight loss is inconsistent with minimal standards. It revoked Padilla's license to practice medicine.

## ISSUES

1. Does due process require the use of the Rules of Evidence in this case?

2. Does the Minnesota Government Data Practices Act preclude the admission of evidence seized by the Medicaid Fraud Unit of the Attorney General's office?

3. Was Padilla's right to cross-examine witnesses violated?

4. Did the administrative law judge err by refusing Padilla access to certain records?

5. Are the conclusions related to Padilla's prescription practice supported by substantial evidence?

6. Are the conclusions related to Padilla's sexual activities supported by substantial evidence?

## ANALYSIS

1. Padilla contends that his constitutional due process rights were violated because the evidentiary rules applicable to an administrative proceeding, Minn.Stat. § 14.60, do not meet the constitutional level of due process required "when a medical license is proposed to be revoked." He specifically argues that due process requires adherence to the Rules of Evidence and this is especially true where credibility is at issue. He asks this court to apply the balancing test set forth in *Mathews v. Elridge* for deter-

mining whether the administrative procedures are sufficient:

First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Elridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ This constitutional challenge was not raised in the administrative proceeding below. However, this court may consider a constitutional issue raised for the first time on appeal from an administrative tribunal when the appellant is raising the issue at the first opportunity in a forum possessing subject matter jurisdiction. *Neeland v. Clearwater Memorial Hospital*, 257 N.W.2d 366, 368 (Minn.1977).

■ In making his argument, Padilla assumes, without authority, that the Rules of Evidence are needed to conduct a fair hearing. We make no such assumption. The Rules of Evidence were "clearly designed for jury trials, not for non-jury trials * * *" such as those held in a contested case before an administrative law judge. 3 Davis, *Administrative Law*, § 16.3. There has been no comparative study of the two systems to determine which produces better results. *Id.* at § 16.1. Indeed, the rules used in agency law have "worked so well for more than three decades that no significant proposal has been made to change [them]." *Id.*

Wigmore quoted Sir Henry Maines's statement that the "system of technical rules * * * fails * * * whenever the arbiter of facts * * * has special qualifications for deciding them" and made his own declaration: "These sagacious observations of Sir Henry Maine may serve to warn us that any attempt to apply strictly the Jury-Rules of Evidence to an administrative tribunal acting without a jury is an historical anomaly, predestined to probable futility and failure." Evidence, § 4(b) (3rd ed. 1940).

*Id.* § 16.3. Since juries do not sit in contested cases, we are unpersuaded that the use of the Rules of Evidence would provide a fairer hearing than the rules contained in Minn.Stat. § 14.60 and the accompanying rules, Minn.R. 1400.7300.

■ Padilla also complains that his due process rights have been violated by a ruling made by the administrative law judge. Just before the hearing, Padilla and the State became aware of a police report and a tape recording. Padilla asked for a continuance of the hearing to review the documents. The administrative law judge denied the motion. However, Padilla did not testify until after he had an opportunity to review the tape. Since Padilla was permitted to refrain from testifying until he had received a copy of the tape recorded conversation, we find no prejudice.

2. On July 31, 1984, the Medicaid Fraud Unit of the Minnesota Attorney General's office seized patient records from Padilla's office. Subsequently, these records were transferred to the Board in connection with the Board's investigation. Among the records transferred were those of M.C., D.C., L.H., and B.F. These records consist of notes made by Padilla, his associates, and other doctors. The Board offered the records into evidence in support of its allegations that Padilla improperly prescribed drugs to patients. The administrative law judge allowed the records into evidence after the Board agreed to edit out patient names and a hearing in which he determined that Padilla had shown no prejudice.

Padilla contends that the records should have been excluded from evidence because the inter-agency transfer of the records violates the Minnesota Government Data Practices Act.

■ Assuming that the records are private data, the restrictions on their dissemination are meant to protect the subject of the records, not Padilla.

[T]he law attempts to reconcile the rights of data subjects to protect personal information from indiscriminate disclosure with the right of the public to know what the government is doing. The Act also attempts to balance those competing rights within a context of effective government operation.

Gimberling & Weissman, *Data Privacy: Everything You Wanted to Know About the Minnesota Government Data Practices Act—From "A" to "Z"*, 8 Wm.Mitchell L.Rev. 573, 575 (1982). Thus, we question Padilla's standing to assert rights provided under the Act to subjects of the data. However, we need not address this issue because the inter-governmental transfer of the records in this case did not violate the Act.

Minn.Stat. § 13.82 (1984) governs agencies "which carry on a law enforcement function." Padilla acknowledges that the records in question were seized by the Medicaid Fraud Unit of the Attorney General's office pursuant to a search warrant for a pending criminal action, specifically welfare fraud. "Investigative data collected * * * to prepare a case against a person * * * for the commission of a crime * * * is confidential data while the investigation is active." Minn.Stat. § 13.82, subd. 5. A case is active unless there has been a decision not to pursue the case, or the statute of limitations has run. *Id.* In this case, the assistant attorney general averred that the investigation was active. Thus, there was no decision not to pursue the case. Padilla made no assertion that the statute of limitations had run. Under subdivision 8, the Medicaid Fraud Unit "may make any investigative data classified as confidential * * * accessible to any * * * agency * * * if [it] determines that the access will * * * promote public safety * * *." The Medicaid Fraud Unit could properly give the records to the Board under this broad grant of power.

■ Even if the Fraud Unit had transferred the records to the Board in violation of the Act, Padilla cites no authority to support its proposition that the records were improperly admitted into evidence. We are aware of none. *See United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (information obtained in violation of respondent's fourth amendment rights was ordered suppressed in any ensuing criminal proceeding but not in an administrative proceeding).

3. Padilla also argues that his rights of confrontation and cross-examination were violated because his medical records of four patients were admitted. Padilla overlooks the fact that he is the declarant of the information in the charts. While the charts did contain notations made by other physicians, the notations had no bearing on this proceeding, except to the extent that Padilla relied on them in administering his own treatment.

■ Based on the records, Padilla was questioned about his treatment of the four patients. The Board did not attempt to impeach Padilla's credibility with respect to the notations contained in the records. Two experts testified about the quality of Padilla's care as reflected by the records. Both were cross-examined. We find no violation of Padilla's rights to cross-examine or confront witnesses.

4. At the commencement of the hearing, Padilla obtained a subpoena permitting him to obtain all the medical and psychological records from any and all physicians of four former patients who had testified on behalf of the Board. All four patients signed waivers of their privilege with respect to their treatment by Padilla. Padilla sought the records to impeach the credibility of the Board's witnesses. Upon the Board's motion, the administrative law judge quashed the subpoenas. Padilla now contends that the denial of access to the records constitutes reversible error. Specifically, he argues that by testifying the witnesses waived their medical privilege under Minn.R.Civ.P. 35.03.

In a contested case hearing, any means of discovery available pursuant to the Rules of Civil Procedure is allowed.

Minn.R. 1400.6700, subpart 2. Minn.R. Civ.P. 35.03 provides:

> If at any stage of an action a party voluntarily places in controversy the physical, mental or blood condition of himself * * * such a party thereby waives any privilege he may have in that action regarding the testimony of every person who has examined or may thereafter examine him * * * in respect to the *same* mental, physical or blood condition.

*Id.* (emphasis added). The administrative law judge ruled that the four witnesses are parties for the purposes of Rule 35.03, but that Padilla failed to establish that the witnesses placed a medical condition or mental condition in issue.

■ We need not decide whether the witnesses were parties for the purposes of Rule 35.03 to agree with both the administrative law judge's reasoning and decision that the witnesses had not placed a medical or mental condition in issue.

The charges against the Respondent are that he prescribed drugs where there was no medical indication that they were needed, that he prescribed drugs in excess of acceptable durations, that he inappropriately prescribed drugs to known drug users and persons known to have forged prescriptions, that he made improper sexual advances and engaged in inappropriate sexual contacts with patients, including sexual intercourse with patients, and that he conducted unnecessary pelvic examinations of some patients. At issue here is the acceptability of Respondent's treatment, and his sexual actions, not the witnesses' physical, mental or blood conditions.

In determining whether the Respondent's actions were appropriate, the treatment they may have received from other doctors was not shown to be relevant or material. Whether other doctors made similar prescriptions is irrelevant. What is in issue is acceptable medical practices. That must be established by expert testimony and does not justify discovery of the witnesses' privileged medical records.

\* \* \* \* \* \*

Since the mental condition of the four witnesses who testified against the Respondent is not placed in issue by their testimony regarding the treatment they received, the Respondent's subpoena, which includes a request to examine medical records concerning any mental conditions they have sought treatment for, must be denied. If the rule were otherwise, a party could discover the psychiatric records of every adversary in the hope that a mental condition or personality trait reflecting on his credibility could be found. The law does not permit such an inquiry in every case and should not be permitted here.

5. Padilla contends that the evidence is not sufficient to support the conclusion that his prescription practices violate Minn. Stat. § 147.021(g) or (k). This statute provides:

> The board shall censure * * * shall order reexamination, or shall suspend, revoke, condition, limit, qualify or restrict the license * * * of any person * * * who the board determines after such a hearing is any one or more of the following:
>
> \* \* \* \* \* \*
>
> (g) a person who engages in any unethical, deceptive or deleterious conduct or practice harmful to the public, or who demonstrates a willful or careless disregard for the health, welfare or safety of his patients, in any of which cases, proof of actual injury need not be established.
>
> \* \* \* \* \* \*
>
> (k) a person who is guilty of unprofessional conduct. Unprofessional conduct shall include any departure from or the failure to conform to the minimal standards of acceptable and prevailing medical practice in which proceeding actual injury to a patient need not be established.

Minn.Stat. § 147.021, subd. 1.

This court will only reverse the Board's conclusion if it is "[u]nsupported by sub-

stantial evidence in view of the entire record as submitted * * *." Minn.Stat. § 14.69(e). Substantial evidence is:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.

*Cable Communications Board v. Nor-West Cable Communications Partnership*, 356 N.W.2d 658, 668 (Minn.1984).

The Board's conclusions 5, 7, 10, 11, and 12 relate to prescription practices. The Board specifically stated that its decision to revoke Padilla's license did not depend on conclusion 11. Accordingly, we will only consider whether substantial evidence supports the remaining four.

*Conclusion 5*

■ The Board found that before a patient is treated for obesity, prevailing medical practice is to take a history and perform a physical examination to rule out medical causes for obesity. Failure to obtain a history and physical examination before treatment could be harmful to the patient and result in ineffective treatment. When anorexigenics are prescribed, it is important to make sure that no medical conditions exist which would counterindicate their use.

While the preferred practice is to take a patient's history and perform a complete physical examination before any long-term treatment, including that for obesity, the ideal is commonly not met. However, the minimal standard of prevailing practice is to conduct an abbreviated physical examination at the initial visit, consisting of the patient's weight, blood pressure, lungs and central nervous system. This would be followed, within eight weeks, with a history, a complete "head to toe" physical, and basic laboratory work.

The Board found that Padilla examined L.W.'s lungs, heart and abdomen. He also gave her a pelvic examination. There is no indication that he took a history. He did not weigh her. He gave her a prescription for Preludin. The Board further found that (1) Padilla treated M.C. with anorexigenic drugs from February 23, 1981 to December 11, 1981, without taking a history or performing a physical; (2) he treated L.H. with anorexigenic drugs from December 19, 1975 through a portion of 1983 without taking a history or performing a physical; (3) he treated D.C. with anorexigenic drugs from March 6, 1981 to October 20, 1981, without taking a history or performing a physical; and (4) he treated B.F. with anorexigenic drugs from April 26, 1982 to February 22, 1984, without taking a history or performing a physical.

Substantial evidence supports these findings. These findings support a conclusion that Padilla departed from the minimal standards of acceptable and prevailing medical practice.

*Conclusion 7*

The Board found that L.W. is 5′1″ tall and did not weigh over 110 pounds when she received a prescription for Preludin from Padilla. It found that L.H. is 5′5½″ tall and weighed 127½ pounds at the time of her first visit to Padilla; she is not obese; and Padilla prescribed Preludin. Substantial evidence supports these findings. These findings support a conclusion that Padilla departed from the minimal standards of acceptable and prevailing medical practice.

*Conclusion 10*

The Board found that Placidyl is a hypnotic drug generally used in a hospital setting for a limited duration of approximately one week. It also found that Placidyl is easily abusable and a long-term prescription of Placidyl to persons who are known to be dependent on it is inconsistent with the minimal standard of care in the field of internal medicine. Padilla does not challenge these findings, nor the findings that he prescribed Placidyl for A.V. from November 1975 through September 1976 without performing a physical examination or obtaining a history and he continued to prescribe Placidyl through August 1978,

even though he knew by early 1977 that A.V. was addicted to barbiturates and sleeping medications. Indeed, Padilla admitted that there are no circumstances in which Placidyl should be used on a long-term basis, that it was not good practice to prescribe it to A.V. for almost a year without doing a history and physical, and that he knew of A.V.'s possible drug abuse. These findings support the conclusion that Padilla departed from or failed to conform to the minimal standards of acceptable and prevailing medical practice.

*Conclusion 12*

The Board found Padilla prescribed anorexiants to D.O., D.S., M.C., and B.F., and that he knew these patients were chemically dependent, were abusing drugs, or had abused drugs. Padilla does not challenge these findings. The Board's expert testified that Padilla should not have continued to prescribe anorexiants to D.O., M.C. and B.F. Padilla's expert testified that Padilla failed to conform to the minimal standards of care in the community when he continued to prescribe anorexiants to D.S. after a pharmacist told Padilla's office that D.S.'s prescription for Preludin had been altered. His expert also stated that Padilla's prescribing anorexiants to B.F. after receiving information regarding her drug use from the police department was unprofessional conduct. We conclude that conclusion 12 is supported by substantial evidence.

6. Padilla finally contends that the evidence is not sufficient to support conclusions that he engaged in sexual activities constituting unethical or unprofessional conduct. Specifically, Padilla challenges the credibility of D.O., L.W. and A.V., and says he proved himself to be candid, honest and forthright.

Initially, we note that the Board concluded that Padilla made unwarranted sexual advances, touchings and solicitations of D.S. and had nonconsensual sexual intercourse with M.R. during the course of a pelvic examination contrary to the provisions of Minn.Stat. § 147.021, subd. 1(g) and (k). Padilla does not challenge the credibility of D.S. or M.R. or the conclusions made by the Board.

The administrative law judge found that both L.W. and D.O. had undergone chemical dependency treatment after their relationship with Padilla ended and that both were off drugs at the time of the hearing. He further found that the testimony of D.O., L.W. and A.V. was "compellingly persuasive." He stated

> Although the three of them fabricated medical conditions in order to obtain prescriptions from the Respondent and other physicians and although some of these witnesses have a criminal history, their testimony was consistent and believable.

The Board adopted these findings. A court cannot substitute its judgment for a Board's on the credibility of witnesses. *See Arvig Telephone Co. v. Northwestern Bell Telephone Co.*, 270 N.W.2d 111, 117 n. 5 (Minn.1978).

> It has been long established that when the trier of the facts has a choice between conflicting evidence or diverse inferences may be drawn from the evidence, its conclusion must stand unless manifestly and clearly contrary to the evidence.

*Nelson v. Lutheran Mutual Life Insurance Co.*, 311 Minn. 527, 529, 249 N.W.2d 445, 447 (1976). The Board's findings are not manifestly and clearly contrary to the evidence. Substantial evidence supports its conclusions.

The concurring opinion insists that the ALJ should have made specific recommendations "regarding the kind of disciplinary action to be taken." We believe this to be an incorrect interpretation of the Board's function. The reference to discipline of lawyers and judges is inappropriate, since hearing officers are members of the legal profession with expertise to determine discipline.

Boards and commissions like the Board of Medical Examiners are appointed because of their special expertise regarding the standards of their own professions. When a professional person must be disci-

plined for breaching these standards, the nature and duration of the discipline is best determined by his or her fellow professionals, who are in a superior position to evaluate the breaches of trust and unprofessional conduct. As the Minnesota Supreme Court has stated:

"Unprofessional conduct" is conduct which violates those standards of professional behavior which through professional experience have become established, by the consensus of the expert opinion of the members, as reasonably necessary for the protection of the public interest. In establishing the necessity for and the existence of such standards, every member of the profession should be regarded as an expert.

* * * There is a moral dereliction in failure by any member of a profession to apply in professional practice the standards which, by consensus of opinion in the profession, are necessary.

*Reyburn v. Minnesota State Board of Optometry*, 247 Minn. 520, 523–24, 78 N.W.2d 351, 355 (1956) (footnotes omitted) (quoting *Cherry v. Board of Regents*, 289 N.Y. 148, 158, 44 N.E.2d 405, 412 (1942)).

Furthermore, the court has stated that "the assessment of penalties and sanctions by an administrative agency is not a factual finding but the exercise of a discretionary grant of power." *In re Haugen*, 278 N.W.2d 75, 80 n. 10 (Minn.1979). The legislature has conferred upon this Board, and not upon the ALJ, a discretion to determine the type of discipline to impose. To hold that the ALJ should make a recommendation as to the type of discipline would be to usurp the power delegated to the Board.

The correct procedure was employed here. Based on its findings, the ALJ recommended discipline. The type and duration of the discipline was left to the professional Board—Dr. Padilla's peers.

Professionals have a deep responsibility not to abuse the trust which licensure places in them. There is no other profession in which one passes so completely within the power and control of another as does the medical patient. Padilla's license placed him in this position of trust, a trust which he violated.

■■■ The purpose of a Board proceeding concerning the revocation of a license is not to punish the individual; the purpose is to protect the public from dishonest, immoral, disreputable or incompetent practitioners. The function of the Board is, therefore, not only to consider Padilla's acts, but also the harm to the public if such acts remain unpunished and the deterrent effect upon others of a severe penalty.

■■■ Revocation of Padilla's license was proper and mandated by the record. The evidence is overwhelming as to his unprofessional and immoral acts, his abuse of trust regarding controlled substances, and his abuse of women patients.

### DECISION

Padilla's due process rights were not violated because the Board applied the evidentiary rules for use in a contested case, Minn.Stat. § 14.60 (1984). The Minnesota Government Data Practices Act does not preclude the admission of evidence seized by the Medicaid Fraud Unit of the Attorney General's office. Padilla's right to cross-examine witnesses was not violated. The administrative law judge did not err by refusing Padilla access to certain records. Substantial evidence supports each of the conclusions that Padilla's prescription practices constitute unprofessional conduct. Substantial evidence supports the conclusions that Padilla engaged in sexual activities constituting unethical, deleterious, or unprofessional conduct.

Affirmed.

POPOVICH, C.J., concurs specially.

POPOVICH, Chief Judge (concurring specially).

I concur in the result but have reservations strong enough to warrant a separate concurrence.

1. The administrative law judge made 37 findings and 13 conclusions. In his memorandum, he thoroughly discussed the

credibility of D.O., A.V., L.W., D.S. and M.R. Based on his findings and conclusions, he recommended that the Board "take disciplinary action against the license" of Padilla, but made no specific recommendations regarding the kind of disciplinary action to be taken. The administrative law judge admitted evidence ruling that any objection would go to the weight rather than to the admissibility. It is also the administrative law judge who sees the witnesses and must determine credibility. Thus, he should have made specific recommendations regarding the disciplinary action to be taken. The Board, not having seen the witnesses, cannot determine weight and credibility from a cold record. Administrative law judges make specific recommendations in other cases. There is no reason for an exception in disciplinary matters. I would recommend that in future similar cases, the administrative law judge make recommendations as is done by referees in judicial and lawyer discipline matters.

2. Padilla's rights to cross-examine or confront witnesses were limited. Padilla should have had the opportunity to cross-examine the patients who were the subject of the medical records introduced. Further, he should have had the opportunity to cross-examine the other preparers of the medical records.

3. Finally, offers of proof and arguments on objections were made by the Board's counsel within the hearing of witnesses and suggested answers expected of the witnesses. It amounted to witness coaching. This is not good practice and should be prohibited by the administrative law judge.