*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0400**

In the Matter of the License of Jeffrey L.
Olson, Psy.D., L.P., License No. LP4532

**Filed December 12, 2016
Affirmed
Jesson, Judge**

Minnesota Board of Psychology

Philip G. Villaume, Thomas H. Priebe, Villaume & Schiek, P.A., Bloomington, Minnesota
(for relator Jeffrey L. Olson)

Hans Anderson, Jason Timothy Pleggenkuhle, Assistant Attorneys General, St Paul,
Minnesota (for respondent Board of Psychology)

Considered and decided by Kirk, Presiding Judge; Bjorkman, Judge; and Jesson,
Judge.

**U N P U B L I S H E D   O P I N I O N**

**JESSON**, Judge

Relator Jeffrey Olson challenges respondent Minnesota Board of Psychology's 36-
month suspension of his license to practice psychology. Because our review convinces us
that Olson was not denied due-process protections and that the board's decision was based
on substantial evidence in the record, and is not arbitrary and capricious, we affirm.

## FACTS

Olson, a licensed clinical psychologist since 2004, operated a psychology practice in greater Minnesota where he regularly treated over 100 clients. In May of 2012, at the request of a client's medical provider, he conducted psychological testing on the client, A.K. Olson administered tests in one session and then met with A.K. to discuss her results in a second session in June 2012. Olson was professional at all times during the two sessions. There was no physical contact other than a handshake.

While the patient-therapist relationship ended after the June session, Olson continued to talk to the client regularly because his office was across from her regular psychologist's office. In July, A.K. reached out to Olson and invited him to a gathering at her friend's house. The two became friends and, as time went on, they developed feelings for each other. In August or September 2012, their relationship became sexual. A Board of Psychology rule prohibited licensees from engaging in a sexual relationship with a former client for two years after the date of the last professional contact with the client. Minn. R. 7200.4900, subp. 8 (2011).[1] Olson told A.K. that he could lose his license if they became romantically involved, but she was worth the risk. The couple began living together in October 2012. And in November 2012, Olson opened Lake Superior

---

[1] The 2011 version of the rule was in effect at the time of Olson's conduct. Minnesota Rule 7200.4900, subpart 8, was repealed and re-codified in 2013. 37 Minn. Reg. 1084, 1085-86 (Jan. 22, 2013) (finalized rule at Minn. R. 7200.4905 (2015)). While the new rule does not change the substance of this particular prohibition, the rule now extends the prohibition of a sexual relationship indefinitely for a former client who is vulnerable or dependent on the provider. *See* Minn. R. 7200.4905, subp. 6.

Psychological Services, Inc. He gave A.K. a 49% ownership interest in the business, where she served as the office manager. A.K. never considered Olson to be her psychologist.

While initially the relationship between Olson and A.K. was mutual and caring, it began to deteriorate over the following year. They continued to operate the business together, but money became tight and tensions rose.[2] As the stress increased, the couple ended up in a physical fight. In November 2013, A.K. obtained an order for protection against Olson, which he violated one month later; Olson pleaded guilty to misdemeanor domestic abuse.

After the romantic relationship worsened, A.K. made a report to the board regarding Olson. While she later asked the board not to discipline Olson—and testified on Olson's behalf at a hearing before an administrative-law judge (ALJ)—the complaint-resolution committee of the board initiated an action against Olson on June 3, 2014, to determine whether he should be disciplined based on his relationship with A.K.[3] The committee alleged five grounds for discipline based on A.K.'s information that Olson had engaged in a sexual relationship with her.[4]

---

[2] At one point, Olson told A.K. that if she was going to hurt, shoot or kill herself, she should go ahead and do it. Olson also told A.K. that he thought she was bi-polar, without having conducted a psychological examination.

[3] The complaint-resolution committee is a board subcommittee that reviews, investigates, and pursues jurisdictional complaints made against licensees of the board. Minn. Stat. § 214.103, subds. 2, 6, 7 (2014). In matters such as this, the committee acts in a quasi-prosecutorial role, presenting evidence to the full board concerning a licensee's potential violations of the Psychology Practice Act. Committee members do not deliberate on cases brought by the committee. *See* Minn. Stat. § 214.103, subd. 7. The committee retains its own counsel.

[4] The grounds were as follows:

Because Olson admitted that he engaged in a sexual relationship with a former client, the committee moved for partial summary disposition that Olson's conduct violated a rule the board was empowered to enforce (sexual intercourse with a former client) and that he failed to conform to minimum standards of acceptable practice. The ALJ recommended summary disposition on these grounds. The committee then dismissed some factual allegations and the remaining grounds for discipline. The dismissed factual allegations, which form the basis of Olson's due-process appeal, included:

- Olson told the client that he could lose his license to practice psychology if anyone found out about their relationship, but she was worth the risk;
- Olson invited the client to move in with him, and she did;
- Olson gave the client 49% ownership interest when she helped him start a private practice in greater Minnesota where he provided psychological therapeutic services to clients; and
- Olson violated the client's order for protection and pleaded guilty to misdemeanor domestic abuse.

The committee proposed that the parties stipulate to the facts absent the dismissed allegations and submit the ALJ's summary-disposition order directly to the full board for

---

- Violating a statute, rule, or order that the board issued or is empowered to enforce.
- Engaging in unprofessional conduct or any other conduct which has the potential for causing harm to the public, including any departure from or failure to conform to the minimum standards of acceptable and prevailing practice, without actual injury having to be established.
- Providing psychological services to a client when the psychologist's objectivity or effectiveness is impaired by a dual relationship with the client.
- Exploiting the professional relationship with a client for the psychologist's emotional, financial, sexual, or personal advantage or benefit.
- Engaging in sexual intercourse or other physical intimacies with a client and/or engaging in verbal or physical behavior which was sexually seductive or sexually demeaning to a client.

4

consideration, but Olson requested an evidentiary hearing before the ALJ. He sought to provide additional evidence, especially regarding mitigating circumstances that the board should consider. A full-day hearing was held. Olson and A.K. testified and were cross-examined.

Based upon the record, the ALJ issued an order recommending the imposition of discipline. But the order highlighted several mitigating circumstances regarding Olson's relationship with the client: the professional relationship was limited in scope and duration; there was no evidence that the client was harmed by the relationship due to his status as a psychologist; the relationship was mutual and caring; Olson never exercised his position as a psychologist to control the client; Olson was genuinely remorseful about his conduct; and a prolonged suspension may harm Olson's other clients.

The board held a hearing on November 20, 2015. At the hearing, the committee requested a suspension of at least 60 months. Olson urged the board to consider the mitigating facts the ALJ identified, and he recommended, at most, 90 days of suspension. The board decided to indefinitely suspend Olson's license to practice psychology with the proviso that Olson could request reinstatement after 36 months.[5] After an unsuccessful hearing for reconsideration and a stay of suspension, this certiorari appeal follows.

---

[5] To do so, Olson must complete a report reflecting on his conduct that led to his suspension, submit to a psychological evaluation, and enroll in a one-on-one professional boundaries course.

5

**DECISION**

Olson challenges the suspension of his license, arguing that the board violated his due-process rights, the decision was not based on substantial evidence in the record, and the length of suspension was arbitrary and capricious.

Administrative-agency decisions are presumed to be correct and "may be reversed only when they are arbitrary and capricious, exceed the agency's jurisdiction or statutory authority, are made upon unlawful procedure, reflect an error of law, or are unsupported by substantial evidence in view of the entire record." *In re Revocation of the Family Child Care License of Burke*, 666 N.W.2d 724, 726 (Minn. App. 2003); Minn. Stat. § 14.69 (2014). But we are not bound by the agency's ruling on matters of law. *Burke*, 666 N.W.2d at 726.

## I. The board did not violate Olson's procedural due-process rights because its decision was based on facts properly in the record.

Olson contends that the board violated his due-process rights because it relied on facts that were dismissed. In essence, he argues that he was not on notice that the dismissed factual allegations would be considered by the board in reaching its decision concerning his discipline. Olson further argues that the board violated due process by preventing him from presenting evidence of settlement discussions at the board hearing. We disagree. The board's decision is based on facts properly in the record, as developed at the evidentiary hearing that Olson requested. Further, the board's decision to not admit evidence of settlement discussions was not an error of law.

6

When a licensee challenges an issue of law, such as legal adequacy of due process, we review de novo. *In re License of W. Side Pawn*, 587 N.W.2d 521, 522 (Minn. App. 1998), *review denied* (Minn. Mar. 30, 1999). It is well settled that professional licenses are a property right deserving constitutional protection including due process. *See In re Rerat*, 224 Minn. 124, 128-29, 28 N.W.2d 168, 172-73 (1947); *Humenansky v. Minn. Bd. of Med. Exam'rs*, 525 N.W.2d 559, 566 (Minn. App. 1994), *review denied* (Minn. Feb. 14, 1995). Due process is the opportunity to be heard, specifically: timely and adequate notice and an opportunity to defend and present evidence. *Humenansky*, 525 N.W.2d at 565 (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-68, 90 S. Ct. 1011, 1020 (1970)).

When examining due-process challenges, we are mindful that an agency is prohibited from considering factual information that is not part of the record in making its decision. Minn. R. 1400.8100, subp. 1 (2015). But the record in contested cases is broad and comprehensive. It contains all pleadings, motions, orders, evidence offered or considered, memoranda, or data submitted by any party. Minn. R. 1400.7400, subp. 1 (2015); *see* Minn. Stat. § 14.60, subd. 2 (2014).

Olson argues that the board's consideration of facts dismissed from the complaint (that he told A.K. he could lose his license, that he invited her to move in with him, that he gave her an ownership interest in his business and later violated an order for protection) violated his due-process rights because he did not have proper notice that these allegations would be asserted against him. As a result, Olson claims he could not prove that the allegations were untrue or did not merit discipline.

7

The previously dismissed factual allegations came before the board because they were contained in the ALJ's order recommending discipline. Olson requested the evidentiary hearing to establish a record of mitigating circumstances. To do so, both he and A.K. testified about their relationship and, in doing so, opened themselves up to cross-examination regarding it.

At the hearing, some of the circumstances surrounding his sexual relationship with A.K. were elicited by Olson's counsel. For example, Olson's counsel asked A.K. if she moved in with Olson in October of 2012, which was one of the "dismissed factual allegations." More facts related to the dismissed allegations were brought out in cross-examination concerning Olson's and A.K.'s description of their relationship. For example, when asked if he understood professional boundaries and if he told A.K. that he could lose his license if anyone found out about their relationship, Olson admitted these facts. Olson also admitted that he was in a relationship with A.K. when he opened up his private practice. He testified that he invited A.K. to move in with him.

A.K. agreed to testify on Olson's behalf at the evidentiary hearing. On direct examination, she testified about their work together in his psychology practice during their relationship. She also said that she was happy during the relationship but regretted the way it ended. On cross-examination, when asked if there were times that she was not happy in their relationship, A.K. explained that she was not happy toward the end. The committee's

8

counsel then asked her if she had requested an order for protection against Olson.[6] A.K. responded "yes" and then described the end of the relationship as follows:

> Things became extremely tense between us. Money was tight. The business was not where it could have been, I guess, at that point. And we ended up fighting and it became physical. So it just—[e]motions ran so high and everyone was so stressed out, I think, that there was just sort of an explosion at the end.

Based upon the testimony at the evidentiary hearing, the ALJ made findings of fact, conclusions of law, and a recommendation regarding reasonable and appropriate discipline, which went to the board. In suspending Olson's license, the board relied upon the ALJ's report. To the extent that the ALJ's report referred to the dismissed factual allegations, that should not have surprised Olson. He requested the evidentiary hearing acknowledging that the ALJ "may decide that there are other factors relevant to this matter." Olson's contention that he was not on notice that these facts could be considered by the board when he requested a hearing and elicited testimony about his sexual relationship with A.K. is unrealistic and unavailing.

Nor did the board violate Olson's due-process rights by preventing him from discussing previous settlement offers. At the board hearing, Olson attempted to discuss previous offers that the committee had made in their settlement negotiations. He objected to the committee's request for a 60-month suspension, implying that the committee was punishing him for electing an evidentiary hearing instead of submitting the matter directly

---

[6] Olson objected to relevance. The ALJ overruled his objection, determining that the testimony was relevant to mitigating or aggravating factors. These facts were properly in the record and form the basis of the ALJ's findings of fact and recommendations regarding discipline.

to the board. The committee noted that it hoped to avoid a contested evidentiary hearing because of the strain it placed on the client. The board then precluded the parties from further discussing settlement negotiations.

The board's decision to exclude evidence of settlement negotiations at an administrative hearing was not an error of law. Settlement offers are typically not admissible as evidence. Minn. R. 1400.5950, subp. 6 (2015) (offers to compromise or statements made during mediation are not admissible); *see Padilla v. Minn. State Bd. of Med. Exam'rs*, 382 N.W.2d 876, 882 (Minn. App. 1986) (commenting on the fairness of the administrative rules of evidence), *review denied* (Minn. Apr. 24, 1986).

Moreover, the record closed upon filing exceptions to the ALJ's recommendation. Minn. Stat. § 14.61 (2014) (when an administrative law judge makes a recommendation to the agency in a contested case, the record closes when the parties file exceptions to that order). Neither party could offer evidence at the board hearing. If Olson wanted to present evidence of the previous offers made by the committee, his opportunity to make a record of the offer was at the evidentiary hearing. There was no such request.[7]

Neither the board's consideration of dismissed allegations, which were later referenced in the ALJ's report, nor the board's decision to preclude Olson from discussing settlement offers violated Olson's right to procedural due process.

---

[7] We do not reach the issue of whether the settlement offer would have been admissible as evidence at the hearing before the ALJ.

**II.    The board's decision to suspend Olson's license to practice psychology was based on substantial evidence in the record.**

Olson argues that the board's suspension of his license is not supported by substantial evidence when viewing the record as a whole. Olson is particularly concerned that the evidence in the record is insufficient because the board rejected two of the ALJ's findings of fact and deleted two instances of the use of the word "mitigating" from the ALJ's order.

Every decision of a board must be based on the record. Minn. Stat. § 14.62, subd. 1 (2014). An agency has the authority to reject or modify a finding of fact so long as it includes a reason for each rejection or modification. *Id.*[8] A decision is supported by substantial evidence if there is relevant evidence that a reasonable person might accept as adequate to support a conclusion, more than a scintilla of evidence, more than some evidence, more than any evidence, or the evidence considered in its entirety. *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 466 (Minn. 2002).

There is substantial evidence to support the board's decision to suspend Olson's license. Here, the parties do not dispute that Olson had a sexual relationship with a client. Olson admitted that he engaged in a sexual relationship with a former client that started

---

[8] An ALJ's report is not binding on the agency, although it is entitled to some weight. *In re Denial of Eller Media Co.'s Applications for Outdoor Advert. Device Permits*, 664 N.W.2d 1, 6-7 (Minn. 2003); *see also In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 274 (Minn. 2001) (explaining that the board does not need to treat the ALJ's recommendation with the same deference an appellate court must accord the findings of a trial court).

within three months of their last professional contact. He began this relationship knowing that his conduct violated the rules of his profession.

The board's rejection of 2 of the 23 findings of fact by the ALJ does not change this analysis. The board rejected the ALJ's findings of fact that: (1) Olson never abused his position as a psychologist to exert control or power over the client, and (2) a prolonged suspension would likely cause harm to Olson's patients.

We have previously underscored that boards and commissions "are appointed because of their special expertise regarding the standards of their own professions." *Padilla*, 382 N.W.2d at 886; *see* Minn. Stat. § 148.941, subd. 2 (2014) (granting boards discretionary authority to discipline licensees). When a professional must be disciplined, his or her fellow professionals are in the best position to evaluate the breaches of their professional responsibility and to determine the nature and duration of the discipline. *Padilla*, 382 N.W.2d at 886-87.

While a board's rejection of an ALJ's findings without explanation will invite additional scrutiny, *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001), here the board provided contemporaneous reasons for its rejection of two findings. In rejecting the finding that Olson never abused his position as a psychologist, the board explained that "[i]n the practice of psychology, there is an inherent power differential in a patient-therapist relationship . . . wherein the therapist exercises power over the client" and that "[c]ontrary to [the ALJ's finding], it cannot be definitively stated that Olson did not use his power to the [detriment] of the client."

12

The board further noted that the necessity for the client to obtain an order for protection against Olson (and his violation of that order) as well as the short amount of time between the end of his professional relationship with A.K. and the beginning of their sexual relationship, also contradict the ALJ's definitive assertion that Olson did not use his power to the detriment of the client. The board's explanation for its rejection of this finding reflects its understanding of the potential for influence in a relationship with a former client. It is rooted in the expertise of the board and its understanding of the standards of practice for psychologists.

The board also rejected the finding that a prolonged suspension may hurt Olson's patients. The board explained that this potential harm to patients does not mitigate Olson's conduct, given that the alleged harm was caused by Olson himself. Further, the board noted that patients, like Olson's, who have serious and persistent mental illness are most in need of a therapist with "a solid understanding and practice of maintaining good boundaries." As the board reasoned, Olson's sexual relationship with a former client does not demonstrate this critical understanding. Although Olson asserts that none of his other patients were harmed by his relationship with A.K., the board is in a superior position to assess breaches of trust in the profession.

Finally, by deleting two uses of the word "mitigating," the board did not reject the ALJ's report completely; on the contrary, the board itself determined whether a fact was mitigating or aggravating and reached conclusions based on the collective expertise of the psychologists of the board.

13

In summary, the board's few changes to the ALJ's factual findings were based on its professional expertise and do not alter the substantial evidence in the record that supports the decision to suspend Olson's license.

### III. The board's disciplinary action is not arbitrary and capricious.

Finally, Olson challenges the severity of his suspension, arguing that it is arbitrary and capricious because the board, without explanation, imposed a longer suspension than the committee previously offered in settlement negotiations and failed to address the ALJ's recommended mitigating factors.[9]

A decision is not arbitrary and capricious if there is a rational relationship between the decision and the facts. *In re Review of 2005 Annual Automatic Adjustment of Charges*, 768 N.W.2d 112, 120 (Minn. 2009). A board's assessment of discipline is an exercise of a discretionary grant of power, not a factual finding, and we will not interfere with the decision unless a clear abuse of discretion is shown. *In re Haugen*, 278 N.W.2d 75, 80 n.10 (Minn. 1979). A board or agency is in a superior position to determine the nature and duration of discipline imposed on a licensee due to its expertise regarding their own standards of the profession. *Padilla*, 382 N.W.2d at 886-87.

Even if this court disagrees with the length of Olson's suspension, we must affirm if the board's suspension of Olson's license was rationally related to undisputed facts in

---

[9] Olson also argues that the discipline is arbitrary and capricious because the board suspended him from practice longer than a different licensee who, Olson alleges, posed a greater risk to the public. But we defer to the board's judgment and expertise in regulating the profession of psychology as long as it is not arbitrary and capricious. Here, a 36-month suspension was within the board's discretionary authority.

14

the record. *See Annual Automatic Adjustment Charges*, 768 N.W.2d at 120 (if the facts support two opinions on the matter, an agency's decision is not arbitrary and capricious, "even though the court may believe that an erroneous conclusion was reached"). Here, Olson had a sexual relationship with a client knowing that this relationship violated the Psychology Practice Act. This was not a "technical" violation. As the board pointed out, psychologists who serve patients with serious and persistent mental illness—the most vulnerable—must have a "solid understanding and practice of maintaining good boundaries." And the board, not this court, is in the best position to determine the length of suspension necessary to deter similar ethical violations by licensees. There is a rational relationship between the undisputed fact of the sexual relationship and the board's suspension of Olson's license.

Olson's argument that the suspension is arbitrary because it is longer than the settlement proposed by the committee before the evidentiary hearing does not persuade us otherwise. First, any proposed settlement between Olson and the committee would have to be approved by the board.[10] There is no indication in this record that the board would automatically do so. Second, the factual record created before the ALJ and the ALJ's report provided additional context for the board when making its decision on the length of suspension. That additional context, created after the committee's settlement offer, may have influenced the board, which largely adopted the ALJ's findings. We further note that

_____

[10] As the board argues, if the board were limited by settlement offers, it would lose its statutory discretion to determine the appropriate type of discipline. *See* Minn. Stat. § 148.941, subd. 2(b) (listing potential disciplinary sanctions).

15

the sanction the board ultimately assessed—a 36-month suspension—was significantly less than the 60-month suspension recommended by the committee.

Nor are we persuaded that the board's failure to adopt each of the ALJ's factual findings and mitigating factors renders the decision arbitrary and capricious. As we stated in *Padilla*:

> Boards and commissions . . . are appointed because of their special expertise regarding the standards of their own professions. When a professional person must be disciplined for breaching these standards, the nature and duration of the discipline is best determined by his or her fellow professionals, who are in a superior position to evaluate the breaches of trust and unprofessional conduct.

382 N.W.2d at 886-87. As addressed above, the board did explain its reasoning in the few areas where it deviated from the ALJ's findings. And the ALJ did recommend that the board take reasonable and appropriate disciplinary action against Olson. Based upon our review of the record, we conclude the board did so.

**Affirmed.**