## In the Matter of the DISCIPLINARY ACTION AGAINST the Dentist License of Joseph H. WANG.

### No. C6-87-1337.

Court of Appeals of Minnesota.

Dec. 29, 1987.

Joe E. Thompson, Schmidt, Thompson, Thompson, Johnson & Moody, P.A., Willmar, for relator Wang.

Hubert H. Humphrey, III, Atty. Gen., Catherine E. Avina, Sp. Asst. Atty. Gen., Minneapolis, for Bd. of Dentistry.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN*, JJ.

## OPINION

SEDGWICK, Judge.

In this contested case proceeding, Dr. Joseph Wang appeals from the Minnesota Board of Dentistry's ("Board's") order (1) suspending his license for making "suggestive or improper advances" to patients and for "improper or unauthorized prescription" of a legend drug, and (2) conditioning a stay of suspension on his paying $35,000 towards the costs of the proceeding. We affirm the suspension, but reverse and remand the imposition of costs.

## FACTS

Wang is a licensed dentist and certified oral maxillofacial surgeon, and he has a Ph.D. in medical pharmacology. Wang has

---

* Acting as judge of of the court of appeals by appointment pursuant to Minn. Const. art. 6,

---

been practicing oral surgery in Willmar, Minnesota, since 1976.

In December 1985, the complaint panel of the Board initiated this proceeding to determine whether Wang's license should be suspended or revoked, on two grounds. First, Wang was accused of making "suggestive, lewd, lascivious, or improper advances" to patients, in violation of Minn. Stat. § 150A.08, subd. 1(6) (1984), and Minn.R. 3100.6200(C) (1983). Wang was also accused of improperly prescribing tetracycline in violation of Minn.Stat. § 150A.08, subd. 1(5) (1982), and Minn.Stat. § 150A.08, subd. 1(5) (Supp.1983).

### 1. *Improper advances.*

The charges as to Wang's alleged improper advances concerned three female patients: D.C., C.J. and N.G. The administrative law judge ("ALJ") made the following findings of fact on this issue.

[D.C.] is a 24–year–old female who was treated by Dr. Wang in the spring and summer of 1983 * * * for the removal of her wisdom teeth * * *.

Before the June, 1983 appointment to remove the last wisdom tooth, [D.C.] had become engaged * * *. At that time, Dr. Wang told [D.C.] that she was a "sweetheart" and that she had "broken his heart" because of the engagement. On July 5, 1983, * * * [w]hen Dr. Wang came into the room to remove the stitches, he again stated that [D.C.] was a "sweetheart" and that she had "broken his heart". After the stitches were removed, [D.C.] got out of the dentist chair * * * and Dr. Wang embraced her. [D.C.] pulled away * * * and entered the hallway leading to * * * the waiting room area. * * *

* * * Dr. Wang approached her and attempted to kiss her. However, [D.C.] turned her head and the "kiss" glanced off her cheek. [D.C.] then hurried out of the office * * *.

*   *   *   *   *   *

§ 1.

[C.J.] was treated by Dr. Wang in the fall of 1983 for the removal of her wisdom teeth. * * * [She] is currently 24 years old.

* * * After the surgery had been completed, [C.J.] awoke from the anesthesia * * *. Right after she awoke Dr. Wang touched one of [her] breasts, rubbing it in a circular motion. Dr. Wang stated to her, "I bet you have a lot of guys chasing you." [She] responded, "No, I have not been out on a date for about a year and a half." Dr. Wang then said, "You have not had sex for a year and a half?" [C.J.] did not respond. Dr. Wang then touched [her] other breast in the same manner as the first. * * *

 *     *     *     *     *     *

[N.G.] is a 24–year–old female who was treated by Dr. Wang * * * on February 11, 1984 for the removal of wisdom teeth. * * *

After the surgery had been completed, * * * Dr. Wang asked [her] if she had a lot of boyfriends, if she got asked out a lot and if she got lonely for male companionship. Dr. Wang then asked her if she would like him to provide her with male companionship. [N.G.] responded negatively to all of these questions. At the same time as the conversation was going on, Dr. Wang began rubbing [her] left hand which was laying across the upper part of her stomach. As he rubbed his hand on her hand, he also rubbed his hand against her breasts. [N.G.] pulled her left hand away when she felt the contact with her breasts.

Later during the "recovery", * * * [N.G.] told him that she wanted to go but Dr. Wang stated that she needed to stay for a few more minutes because he was afraid that he would not be able to see her again. Dr. Wang then looked at [N.G.] and asked her if she thought he was handsome.

The ALJ concluded that the preceding conduct was a violation of Minn.Stat. § 150A.08, subd. 1(6) (1984).

2. *Improper prescription.*

The ALJ made the following findings of fact as to Wang's prescription of tetracycline:

On September 10, 1982, Dr. Wang extracted a wisdom tooth from David Jefferson * * *. * * * Dr. Wang noticed that David Jefferson had acne on his face.

Gordon Jefferson, David Jefferson's father, contacted Ray Pierskalla, a pharmacist in the same building as Jefferson and Dr. Wang, to procure medication to treat his son's acne in early 1983. Mr. Jefferson stated that he was a medical doctor * * *. Subsequently, * * * Pierskalla discovered that Mr. Jefferson was not a licensed M.D.

On Saturday, March 26, 1983, Mr. Jefferson telephoned Mr. Pierskalla from his office to order a refill of tetracycline for his son. * * * Dr. Wang then walked into Jefferson's office and was asked by Jefferson to authorize the prescription of tetracycline. Dr. Wang consented, talked to Pierskalla on the phone, and authorized the prescription for David Jefferson. * * * Subsequently, Dr. Wang authorized refills of the prescription for tetracycline on April 23, July 9 and August 22, 1983.

The ALJ concluded:

Dr. Wang violated Minn.Stat. § 150A.08, subd. 1(5) (1984) by prescribing tetracycline to David Jefferson and authorizing refills on that prescription through August of 1983.

3. *Recommendation and order.*

The Board adopted the ALJ's findings and conclusions and ordered Wang's license suspended for at least one year. The order provides for a stay of suspension after 60 days provided Wang complies with certain conditions, including that he pay $35,000 "to help defray the costs the Board incurred in bringing [these] proceedings."

**ISSUES**

1. Is the Board's decision that Wang violated Minn.Stat. § 150A.08, subd. 1(6) (1984), supported by substantial evidence?

2. Is the Board's decision that Wang violated Minn.Stat. § 150A.08, subd. 1(5) (1984), supported by substantial evidence?

3. Did the Board abuse its discretion by conditioning stay of suspension on Wang's paying $35,000 in costs for this proceeding?

## ANALYSIS

### I.

■ The Board concluded that Wang's behavior toward the three female patients violated the following statute:

> The board may * * * suspend or revoke, limit or modify by imposing conditions it deems necessary, any license to practice dentistry * * * upon any of the following grounds:
>
>     *     *     *     *     *     *
>
> (6) Conduct unbecoming a person licensed to practice dentistry * * * or conduct contrary to the best interest of the public, as such conduct is defined by the rules of the board * * *.

Minn.Stat. § 150A.08, subd. 1(6) (1984). The Board's rules define such conduct to include "making suggestive, lewd, lascivious, or improper advances to a patient." Minn.R. 3100.6200(C) (1983).

Wang argues the Board's findings and decision are not supported by substantial evidence. *See* Minn.Stat. § 14.69(e) (1986) (court may reverse administrative findings and decision if they are "unsupported by substantial evidence in view of the entire record"). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn. 1977).

Wang's argument is based on three grounds. First, Wang's auxiliaries testified that they were either present in the room or nearby when the incidents allegedly occurred, and that the incidents did not take place. Second, he argues the patients might have imagined the incidents because of the after-effects of anesthesia. Finally, he argues the alleged behavior is out-of-character for Wang.

The testimony of Wang and his auxiliaries conflicted with the testimony of the complaining witnesses. The ALJ's memorandum decision shows he carefully evaluated the evidence, found the testimony of the complaining witnesses more credible and rejected the contentions Wang now makes to this court.

■ We cannot substitute our judgment for the agency's on the credibility of witnesses. *See Padilla v. Minnesota State Board of Medical Examiners,* 382 N.W.2d 876, 886 (Minn.Ct.App.) *pet. for rev. denied* (Minn. April 24, 1986). Where, as here, the trier of fact has a choice between conflicting evidence, "its conclusion must stand unless manifestly and clearly contrary to the evidence." *Nelson v. Lutheran Mutual Life Insurance Co.,* 311 Minn. 527, 529, 249 N.W.2d 445, 447 (1976). The Board's decision is not clearly contrary to the evidence.

### II.

■ The Board concluded that Wang had violated the 1983 version of Minn.Stat. § 150A.08, subd. 1(5), which was in effect when the second and third refill allegedly occurred. *See* 1983 Minn.Laws ch. 70, § 13. Wang argues (1) the finding that he authorized the last two refills is unsupported by substantial evidence, and (2) even if the finding is correct, the refills did not violate the statute.

#### A. *Evidence of authorizing refills.*

Wang acknowledges he initially prescribed the medicine, but denies authorizing the refills. The ALJ's memorandum explains the basis for his decision:

> [T]he Board's investigator testified that Dr. Wang told him that he had authorized refills for the prescription. Additionally, the pharmacy records show that three refills were made on the prescription and after each of them there is hand-written "OK Dr. Wang." Mr. Pierskalla testified that these "OKs" may have been the result of Mr. Jefferson telling him that Dr. Wang had okayed the refill. However, by that time, Pierskalla's suspicions of Jefferson had been

confirmed and the Judge doubts whether Jefferson's word would have been accepted by the pharmacist. Consequently, the Judge has found that the Board has proved, by a preponderance of the evidence, that the refills on the prescription for tetracycline were authorized by Dr. Wang.

The record supports the ALJ's finding.

### B. *Unauthorized or improper prescription.*

The Board concluded that Wang's authorization of the last two refills fell under this statutory ground for suspension:

Improper or unauthorized prescription * * * of any legend drug * * *.

Minn.Stat. § 150A.08, subd. 1(5) (1984). Tetracycline is a legend drug. *See* Minn. Stat. § 151.01, subd. 17 (1984).

This conclusion, in turn, was based on the conclusion that

prescribing tetracycline to treat David Jefferson's acne was outside the scope of Dr. Wang's practice in this instance.

The ALJ found:

The scope of practice an oral maxillofacial surgeon such as Dr. Wang does not include the treatment of acne unless the surgeon is contemplating a procedure which involves an incision on the facial region. Treatment of acne may then be necessitated to eliminate the risk of infection to the area which is operated on.

This finding is supported by the testimony of the Board's expert witness, Dr. Daniel Gatto. He explained that the underlying license of an oral maxillofacial surgeon is that of a dentist. His testimony makes clear that prescribing tetracycline to treat acne is outside the scope of practice of an oral maxillofacial surgeon, where the treatment is unrelated to any dental work.

Wang argues it is unfair to sanction him for "improper or unauthorized prescription" based on an amorphous "scope of practice" standard. We believe the Board acted properly. The practice of dentistry is statutorily defined. Minn.Stat. § 150A.05 (1982). Wang's prescribing tetracycline to an ex-patient solely to treat acne is so

outside the scope of his practice that he cannot complain he did not know it was improper.

### III.

The Board's order provides that Wang's suspension will be stayed after 60 days if he, among other things, agrees to pay $35,-000 "to help defray the costs the Board incurred in bringing the proceedings." The assessment was not supported by anything in the record.

On appeal, the Board submitted to this court an affidavit from its executive director, setting forth the following costs of this proceeding:

| | |
|---|---|
| Office of Administrative Hearings | $ 7,778.73 |
| Expert Witnesses | 1,699.91 |
| Court Reporters | 3,695.64 |
| Witness Expenses | 70.07 |
| Board Members: | |
| per diems | 1,085.00 |
| travel | 516.68 |
| expenses | 86.50 |
| Attorney General's Office (583.5 hrs. for attorneys and investigators) | $23,828.30 |
| TOTAL | $38,760.83 |

The Board's action raises two issues: (1) can it require Wang to pay for those types of expenses, and (2) was Wang afforded sufficient notice and opportunity to respond to the assessment?

1. Minn.Stat. § 150A.08, subd. 3 (1986) provides:

The board may require the licensee * * * to pay all costs of proceedings resulting in the suspension * * * of license * * *.

■ Wang argues the Board cannot require him to pay the salaries related to this proceeding of the ALJ, the court reporter and the attorney-general's office's attorneys and investigators. Ordinarily, a statute which imposes "costs" on a party does not include items such as attorney's fees. *See McRostie v. City of Owatonna,* 152 Minn. 63, 68, 188 N.W. 52, 54 (1922).

■ The statute here, however, does not provide merely for "costs," but authorizes recovery of "all costs of proceedings." We have interpreted identical language as au-

thorizing recovery of payments for the services of an ALJ and court reporter. *See Proetz v. Minnesota Board of Chiropractic Examiners*, 382 N.W.2d 527, 533 (Minn.Ct.App.1986).

The bulk of the costs assessed against Wang are for the services of the attorney general's office. The Board must compensate the attorney general's office for the reasonable costs of its services. *See* Minn. Stat. § 214.04, subd. 2 (1986). Those costs are "costs of the proceeding" and recovery is therefore authorized by the statute.

■ 2. Although the Board has the discretion to impose those costs, the manner in which it did so was improper. Nothing in the record supports its assessment of $35,000. The affidavit submitted on appeal is not part of the record, *see* Minn.R.Civ. App.P. 110.01, and it was executed more than two months after the order of assessment.

Even if the affidavit had been submitted below, it would not have been a sufficient basis for assessing costs. The affidavit merely lists costs and states they "are supported by statements and receipts maintained in the Board's office." If this were held sufficient, Wang would be unable to evaluate the factual basis for the assessment, and we would have no basis for meaningful review of its accuracy. For example, a typographic or arithmetic error would remain undetected and unchallenged.

■ The Board's procedure for assessing costs in this case raises due process concerns. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (due process requires that deprivation of property be preceded by notice and opportunity to be heard); *Schulte v. Transportation Unlimited, Inc.*, 354 N.W.2d 830, 834 (Minn.1984) (notice must meaningfully inform persons so they can protect interests). A conclusory affidavit is an inadequate basis for assessing $35,000 in costs in the administrative context, where the agency is both charging party and adjudicator.

Wang raised this issue below. His letter to the Board states:

[W]e would like the Board to explain how the amount ordered against Dr. Wang was arrived at so that any inaccuracies or inequities in the assessment of the sum can be determined.

Accordingly, we hold the Board must produce to Wang copies of the underlying "statements and receipts" referred to in the affidavit, and it must provide Wang an opportunity to be heard on this issue. We leave it to the Board to decide the appropriate procedures for complying with this directive.

### DECISION

The Board's order of suspension is affirmed except as to paragraph 3(c), concerning the payment of $35,000. Paragraph 3(c) is reversed and remanded for proceedings in accordance with this opinion.

Affirmed in part, reversed in part and remanded.